# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------X
NEIMAN NIX and DNA SPORTS PERFORMANCE
LAB, INC.,

**Index No.:**

**Plaintiff Designates**
NEW YORK
**County as the place of trial**
**The Basis of venue is**
Defendant's Address

Plaintiff

-against-

SUMMONS:
Plaintiff's address is:
2555 Collins Avenue,
Miami Beach, Florida 33140

MAJOR LEAGUE BASEBALL, OFFICE OF THE
COMMISSIONER OF BASEBALL, d/b/a
MAJOR LEAGUE BASEBALL, ROBERT D.
MANFRED JR., ALLAN H. BUD SELIG,
NEIL BOLAND, and AWILDA SANTANA

Defendants
-------------------------------------------------------------------------X
To the above-named Defendants,

    **YOU ARE HEREBY SUMMONED,** to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on this summons, exclusive of the day of service (or within 30 days after the service
is complete if this summons is not personally delivered to you within the State of New York);
and in case of your failure to appear or answer, judgment will be taken against you by default for
the relief demanded in the complaint.

Dated: November 9, 2016
    New York, New York

Yours etc.,

_____
VINCENT P. WHITE, ESQ.
Attorney for Plaintiff
570 Lexington Ave, Suite 1600
New York, NY 10022

Defendants Addresses:

MAJOR LEAGUE BASEBALL
245 Park Avenue
New York, NY 10167

ROBERT D. MANFRED, JR.
245 Park Avenue
New York, NY 10167

ALLAN H. BUD SELIG
245 Park Avenue
New York, NY 10167

AWILDA SANTANA
245 Park Avenue
New York, NY 10167

NEIL BOLAND
245 Park Avenue
New York, NY 10167

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------X
NEIMAN NIX and DNA SPORTS PERFORMANCE
LAB, INC.,

                          Plaintiff

     -against-

MAJOR LEAGUE BASEBALL, OFFICE OF THE
COMMISSIONER OF BASEBALL, d/b/a
MAJOR LEAGUE BASEBALL, ROBERT D.
MANFRED JR., ALLAN H. BUD SELIG,
NEIL BOLAND, and AWILDA SANTANA

                      Defendants
-------------------------------------------------------------------------X

**VERIFIED
COMPLAINT**

      Plaintiff by his attorney, VINCENT P. WHITE, ESQ., as and for his Verified Complaint

alleges, upon information and belief and at all times hereinafter mentioned, as follows:

## **PARTIES**

1. Plaintiff, Neiman Nix (hereinafter "Nix" or "Plaintiff"), was a resident of Miami-Dade

   County, State of Florida at all relevant times herein. Plaintiff has subsequently relocated

   to his permanent residence and currently resides at 25560 Ramrock Dr., Porter

   Montgomery County, State of Texas.

2. Plaintiff, DNA Sports Performance Lab, Inc., (hereinafter "DNA Sports Lab") at all times

   herein mentioned is a foreign corporation, incorporated in the State of Florida with its

   principal place of business located at 2555 Collins Ave, Miami Beach, Florida 33140.

3. Defendant, Major League Baseball (hereinafter "MLB"), is an unincorporated association

   whose members the thirty (30) Major League Baseball Clubs, with its principal place of

   business located at 245 Park Avenue, New York, New York 10167.

4. Defendant, Office of the Commissioner of Baseball, d/b/a Major League Baseball, is an office created pursuant to the Major-League Agreement entered into by the member clubs of MLB, with its principal place of business located at 245 Park Avenue, New York, New York 10167.

5. Defendant, Robert D. Manfred, Jr. (hereinafter "Manfred"), is an MLB Executive as well as current Commissioner of Baseball. At all relevant times herein, Manfred served as the Chief Operating Officer of MLB, from September 2012 to January 2015, managing the Commissioner's Office on behalf of former Commissioner, Bud Selig (hereinafter "Selig"), and the Executive Vice President for the Labor Relations and Human Resources Department from 1998 to 2012.

6. Defendant, Allan H. "Bud" Selig, is the current Commissioner Emeritus of MLB serving as advisor to Manfred. At all relevant times herein, Selig served as the ninth Commissioner of Baseball from July 1998 to January 2015.

7. Defendant, Neil Boland (hereinafter "Boland"), is a computer analyst as well as MLB's Vice President of Information Security and a former investigator for the Department of Investigation.

8. Defendant, Awilda Santana ("Santana"), at all relevant times herein, was and still is an investigator employed by MLB'S Department of Investigation.

## STATEMENT OF FACTS

### *Plaintiff's Background and History with MLB*

9. Plaintiff, Neiman Nix, is a former professional baseball player drafted by the Cincinnati Reds in 1998 and went on to play for the Milwaukee Brewers and various minor league teams until 2003.

10. During that time, Nix suffered severe injuries to his pitching arm causing him to have nine surgeries and subsequently ending his professional baseball career.

11. Nix's injuries occurred due to the method he was taught to throw certain pitches once he was playing at the professional level.

12. Thus, during the rehabilitation of his arm, Nix worked with several of the top orthopedic surgeons, trainers, bio-mechanists and other professionals not only to rehabilitate his arm, but to learn how to properly apply force while pitching in order to avoid future injuries like the ones he suffered.

13. In 2006, Nix founded the American Baseball Institute (hereinafter "ABI"), a pro-player development academy that ran open tryout free of charge to athletes of age eighteen (18) years and older.

14. The main purpose of ABI was to train and develop athletes.

15. There, Nix taught his players how to throw with the proper force in order to help the players avoid injuries similar to the ones Nix suffered during his time playing at the professional level.

16. By 2009 ABI had grown exponentially, causing Nix to relocate to a larger facility, the former Phillies spring training home in Clearwater, Florida.

17. At no time did Nix represent that any individuals employed by ABI were MLB scouts nor did he maintain employees at his academy that were MLB scouts or otherwise associated with the MLB.

18. Upon information and belief, the MLB viewed ABI as a free agent league that created competition and infringed upon MLB's rights.

19. In or around August 2011, without first contacting Nix, Defendant Santana, an investigator for MLB's Department of Investigations, began contacting current and former players at the ABI, coaches, as well as other members of ABI and the baseball community.

20. Defendant Santana alleged that Nix was infringing on MLB's rights by misrepresenting certain individuals as MLB scouts, representing himself as an MLB agent, and/or running fake tryouts.

21. In late 2011, former MLB player and manager David Kent (hereinafter "Kent") was contacted by an MLB investigator asking him what Kent knew about Nix's academy and falsely stated that Nix was luring players into his academy by having people impersonate MLB scouts.

22. Kent, having worked with Nix at ABI several times, knew these statements were false and informed Defendant Santana that Kent had personal knowledge that numerous scouts from professional teams and colleges did visit ABI, not impersonators.

23. All thirty (30) MLB clubs sent scouts out to evaluate and sign players from ABI, resulting in a great deal of players signing minor league contracts.

24. In fact, Kent would often contact MLB scouts himself and recommend that they go to ABI to view certain players.

25. At this point, Nix had heard from several friends and colleagues, including Kent, that they had been contacted by an MLB investigator making similar allegations.

26. Nix himself had still not been contacted by anyone from the MLB.

27. In or about November 2011, MLB investigator Defendant Santana contacted Nix for the first time regarding these allegations, at which point Nix explained that the allegations

were false and likely came from a disgruntled ex-employee who was fired from ABI for cause, would not vacate an apartment rented by Nix, and had a personal vendetta against Nix.

28. By the time Nix was finally contacted, the rumors regarding Nix making the alleged misrepresentations had already been widespread by MLB's investigators and the damage to Nix's reputation and integrity in the baseball community was already done.

29. On or about December 13, 2011, Nix sent a letter to the Office of the Commissioner of Baseball and Defendant Santana again notifying them that the allegations against him were false and may have come from a disgruntled employee with a personal vendetta against Nix.

30. In the letter Nix further explained that MLB's investigators were making false statements to Nix's clients and that these slanderous remarks were causing Nix's and ABI's reputations irreparable harm.

31. At no time did anyone from MLB respond to Nix's letter and the investigation continued.

32. As a result of MLB's conduct, several players at ABI left abruptly, and in or about January 2012, Nix was forced to sell the majority of his shares in ABI at a fraction of their worth.

***MLB's Concern with Performance Enhancing Drugs and Creation of the Department of Investigations***

33. On or about December 13, 2007, former Maine Senator George J. Mitchell released a report ("Mitchell Report") to the Commissioner of Baseball, Selig.

34. The Mitchell Report outlined an independent investigation describing how and why the use of anabolic steroids and other performance enhancing drugs had emerged in MLB,

and set forth recommendations to the Commissioner regarding how MLB could more effectively address this issue, including the establishment of an investigative department.

35. In January 2008, Commissioner Selig announced the creation of a new Department of Investigations (hereinafter "DOI") within the MLB in immediate response to the Mitchell Report's recommendation to significantly increase MLB's ability to investigate allegations of the use of performance enhancers.

36. The DOI immediately began operations and was headed by former NYPD Deputy Chief Daniel T. Mullin, and Senior Director of Investigations, George Hanna.

37. The DOI functions "independently of the MLB clubs and [has] broad authority to conduct investigations." However, the DOI lacks certain investigative powers including, *inter alia,* subpoena power.

38. As a result, during the DOI's investigation into the Biogenesis clinic in Coral Gables, Florida, Commissioner Selig hired a second team of private investigators, without informing the existing DOI investigators.

39. Indeed, by August 2012, the DOI's primary target was wellness and anti-aging clinics in Florida and Arizona.

### *DNA Sports Lab and MLB's Second Investigation of Nix*

40. In or about May 2012, Plaintiff established a state of the art sports science testing facility for human performance called DNA Sports Performance Lab, Inc., in Miami Beach, Florida.

41. DNA Sports Lab is a diagnostic training and sports medicine clinic that specializes in the research, development, and sale of natural and bio-identical substances to serve as an alternative to harmful performance enhancing drugs such as synthetic anabolic steroids.

42. Nix, after suffering his own injuries that ended his professional career, had invested much of his life to becoming a sports science guru, looking at every facet of performance including, *inter alia*, sleep, nutrition and training.

43. Nix also tested his clients in strength, endurance, efficiency, and recovery in order to help athletes avoid injuries.

44. Nix purchased innovative machinery such as body scanners, hyperbaric chambers, dyno strength machines, bio-electrical medical devices, and motion image tracking machines to test and research existing performance-enhancing supplements with a team of hired doctors in order to further development of new, safe, effective and legal supplements.

45. Nix's clientele at DNA Sports Lab includes both professional and nonprofessional athletes, as well as members of the military.

46. At no time did Nix work with any baseball players at DNA Sports Lab since he was bound by a non-compete agreement with ABI in order to maintain ten percent (10%) ownership in ABI that he had retained.

47. DNA Sports Lab generates business internationally using online services including, inter alia, DNA Sports Lab's website (www.DNAsportslab.com), YouTube, and Facebook.

48. DNA Sports Lab completes its international transactions by utilizing the online worldwide payment system PayPal.

49. DNA Sports Lab develops and sells a specialty supplement line of Bio-identicals/nutraceuticals, which are custom made formulas designed for individual clients with varying ingredients depending on the client's individual test results performed by Nix's team of doctors, as well as the client's desired result from the supplement to naturally help the human body perform.

50. One of the primary ingredients used by Nix and DNA Sports Lab comes from Bio-identical insulin such as Growth Factor is a natural, non-synthetic IGF-1, which is derived from elk antlers.

51. The antler's velvet is scientifically shaved off and made into very potent liquids and creams using Nix's and DNA Sports Lab's scientifically developed methods to produce with a high ration of growth factors that naturally help the human body perform.

52. This line of products has been approved by the World Anti-Doping Agency (hereinafter "WADA"), an international independent agency established in 1999 to promote and coordinate the fight against doping in sport internationally.

53. Nix, through DNA Sports Lab, does not work with MLB players at DNA Sports Lab and has never attempted to market or recommend this product to any MLB player, nor has Nix knowingly sold his product to an MLB player.

54. Nix has never sold testosterone or anabolic steroids and refers any clients seeking hormone based products to outside medical doctors.

55. In fact, Nix's goal in starting DNA Sports Lab was to help eliminate harmful performance-enhancing drugs by creating natural and safe alternatives that do not require a prescription.

56. Representatives from DNA Sports Lab visit professional team organizations, gyms, and colleges to advocate against illegal synthetic steroids.

57. Although Nix has never sold, recommended, or marketed any substance banned by the MLB to any MLB player, the MLB's DOI unjustifiably targeted DNA Sports Lab and Nix.

58. In early 2013, a Miami Times news article uncovered the Biogenesis scandal involving many big-name MLB Players including, *inter alia*, Alex Rodriguez, which was reported by a former Biogenesis employee.

59. Upon information and belief, in response, the MLB deployed approximately thirty (30) investigators to the South Florida area, and Defendants Selig and Manfred both publicly announced that they would be looking into every anti-aging clinic located in South Florida.

60. Upon information and belief, between February and April 2013, MLB investigators, some of whom falsely represented themselves as FBI and DEA agents, contacted many of DNA Sports Lab's clients and Nix's colleagues inquiring about Nix and accusing him of selling illegal substances to MLB players.

61. Upon information and belief, Defendant Santana and Investigator Mullin participated in this investigation by contacting several of DNA Sports Lab's clients and Nix's colleagues.

62. Investigator Mullin oversaw the investigation which was run by Defendants Manfred and Selig.

63. Upon information and belief, Defendant Manfred and Investigator Mullin instead instructed MLB investigators to falsely represent themselves to be or to be working with DEA or FBI agents.

64. In early 2013, Kent was again contacted by MLB investigators and was falsely told that Nix was selling illegal performance enhancing drugs to players, and that MLB was collaborating with the government on a drug scandal Nix was allegedly tied to.

65. At this time, the use of illegal and banned performance-enhancing drugs was a highly publicized issue due to the Biogenesis scandal; and as a result of MLB's false accusations to several members of the baseball community and Nix's clientele, many believed Nix was tied to the scandal and his reputation was quickly tarnished.

66. Nix has no connection to the Biogenesis Clinic, nor had he ever met anyone associated with the clinic or dealt in the sale of any illegal substances.

67. Nix, by and through his former attorney, Alex Hornik, again sent a letter to the MLB requesting that they stop contacting Nix's clients as the false accusations made by the MLB investigators were causing irreparable harm to Nix's and DNA Sports Lab's reputation.

68. In response to the letter, Nix, by and through his attorney Hornik, received a phone call from Investigator Mullin, threatening that if Nix did not "drop it" with the MLB, Mullin would use his connections in law enforcement to have Nix criminally charged for making fraudulent misrepresentations to minors.

69. As a result of Mullin's threat and the MLB's investigative tactics, Hornik resigned from Nix's case.

70. Again, Nix has never worked with clients under the age of eighteen (18), therefore the threatened charge was unjustified and used to intimidate Nix in order to allow MLB to continue to investigate and slander Nix.

71. Upon information and belief, Investigator Mullin was pressured to engage in such extraordinary tactics by MLB's leadership in order to cover up DOI wrongdoing.

72. MLB continued their conduct ignoring Nix's letter, and by April 2013, several clients had stopped purchasing products from Nix.

73. Nix simultaneously noticed an increase in body builders coming to DNA Sports Lab seeking banned substances, due to a false perception of DNA Sports Lab that had been created by MLB's false representations as to DNA Sports Lab's business operations. Nix turned these individuals away.

74. At no time did Nix sell and/or recommend any of his products to any MLB players, nor is he aware of any third party attempting to do the same with his products.

75. No MLB player has ever tested positive for any such substance sold by Nix.

76. As a result of MLB's unjustified investigation, DNA Sports Lab and Nix suffered irreparable harm to their reputations, lost existing clients, and as evidenced by a decrease in sales following MLB's conduct, lost numerous prospective clients.

### *Social Media Accounts*

77. On or about February 18, 2014, Nix filed a complaint against Defendants in Circuit Court of the 11th Judicial Circuit, in and for Miami Dade County, Florida, which was subsequently dismissed without prejudice.

78. Within approximately one day of Nix filing said complaint, MLB became aware of the filing through various social media outlets and was notified of the impending litigation prior to filing by Nix's former attorney, Sholom Boyer (hereinafter "Boyer").

79. Upon information and belief, in retaliation for Nix's filing of the complaint, MLB began hacking/attacking DNA Sports Lab's social media accounts, severely disrupting Nix's ability to do business.

80. At about the same time, Nix's former attorney Boyer's computer was hacked into and destroyed.

81. Neil Boland is currently MLB's Vice President of Information Security and computer analyst.

82. Upon information and belief, investigator Mullin initially hired Defendant Boland to work for the DOI.

83. Upon information and belief, after learning of Boland's expertise as a computer analyst and his ability to skillfully hack computers and accounts through various means and exploits, Defendant Manfred pulled Boland out of the DOI and instructed him to report directly to Manfred as his "right hand man."

84. Upon information and belief, MLB's conduct in attacking DNA Sports Lab's social media accounts was undertaken by or at the direction of Boland.

85. On or about February 19, 2014, DNA Sports Lab's YouTube account was flagged seventeen (17) times from a fake and/or untraceable IP address.

86. By March 13, 2014, DNA Sports Lab's YouTube account was halted entirely.

87. DNA Sports Lab conducts much of its business through a YouTube video posted on its website describing its products.

88. To this day, DNA Sports Lab remains banned from posting on YouTube.

89. By early April 2014, DNA Sports Lab's Facebook account had also been halted.

90. On April 15, 2014, Nix's PayPal account was halted cutting off his ability to do most of his business, since most of his sales are done online, especially with his international clients.

91. Upon detailed records received from a PayPal subpoena, Nix was able to discern that his PayPal account was illegally accessed multiple times from locations that did not match Plaintiff's place of business.

92. Nix hired a computer expert to investigate the interference of Nix's social media accounts.

93. Upon information and belief, YouTube received reports from MLB investigators that Nix was associated with Biogenesis and the sale of illegal drugs to players.

94. The computer expert hired by Nix stated these reports were linked to an IP address in New York, where MLB's headquarters are located.

95. Plaintiff Nix was also able to track down another instance of an illegal login to his PayPal account from the exact zip code of the MLB's attorney's office, Matthew Triggs, in Boca Raton, Florida.

96. As a result of MLB interfering with Plaintiffs and DNA Sports Lab's social media and PayPal accounts, DNA Sports Lab experienced a huge decrease in online sales, as well as significant monetary loss.

97. Since the commencement of the business, Plaintiffs have made millions of dollars in sales internationally by advertising its product in a YouTube video appearing on its website, on Facebook, and finalizing transactions utilizing PayPal.

98. As a result, MLB's conduct in shutting down Plaintiffs and DNA Sports Lab's social media accounts has cost Nix and DNA Sports Lab millions of dollars in sales.

*MLB's Response*

99. On or about July 14, 2016, Nix filed the Complaint commencing a civil action in the Southern District of New York against Defendants.

100. On the same date, Defendant MLB released a statement in response to the commencement of the litigation.

101. The statement on behalf of the MLB falsely alleges that ". . . Nix admits to selling products purportedly containing at least one banned performance-enhancing substance (IGF-1) . . ."

102. Plaintiff has not sold nor did Plaintiff admit to selling any substance which contained any banned performance-enhancing substance.

103. In fact, Plaintiff identified the product he was marketing and selling as being bioidentical to IGF-1 and approved for usage by the WADA.

104. MLB's statement as crafted and released with the intent to portray Plaintiffs' as knowingly marketing and selling banned performance-enhancing substances in order to further hurt Nix's business interests and credibility.

105. As a result of MLB's statement, Nix has been subjected to repeated accusations from customers and potential customers that he is marketing and selling banned substances.

106. Additionally, an overwhelming amount of customers have discontinued purchasing products from Nix due to MLB's statement.

107. The additional damage to Nix's reputation and lost business opportunities is beyond measure.

108. Nix has also suffered additional severe emotional distress as a direct and proximate result of Defendant MLB's false portrayal of Nix as a marketer and purveyor of banned substances.

## AS AND FOR A FIRST CAUSE OF ACTION

*Tortious Interference with Business Relationship/Prospective Economic Advantage*

109. Plaintiffs repeat, reiterate, and realleged each and every allegation made in the above paragraphs in this Complaint.

110. Nix and DNA Sports Lab had existing business relationships with their clients, which Defendants became aware of during their investigation in South Florida.

111. In an effort to again dismantle one of Nix's businesses, Defendants MLB and the Office of the Commissioner of Baseball, by and through its DOI, intentionally and unjustifiably targeted DNA Sports Lab in an investigation for the sale of banned performance enhancers to MLB players.

112. In fact Nix did not work with any MLB players.

113. Nix never marketed any such substance to any MLB player.

115. Nix never recommended any such substance to any MLB player.

116. Nix never sold any such substance to any MLB player.

117. In fact there has never been a MLB player who has ever tested positive for any such substance sold by Nix.

118. Defendant Santana acting on behalf of Defendants Selig, Manfred, the MLB and Office of the Commissioner of Baseball, used improper means during the investigation of Nix and DNA Sports Labs by misrepresenting themselves as law enforcement, and/or was working with law enforcement.

119. Defendant Santana acting on behalf of Defendants Selig, Manfred, the MLB and Office of the Commissioner of Baseball, used improper means during the investigation of Nix and DNA Sports Labs by making unjustifiably fraudulent misrepresentations to Plaintiffs' clients and prospective future clients.

120. Defendant Santana acting on behalf of Defendants Selig, Manfred, the MLB and Office of the Commissioner of Baseball, used improper means during the investigation of Nix and DNA Sports Labs by stating that Plaintiffs were in the business of selling illegal/banned substances and/or were in some way associated with the Biogenesis scandal.

121. An investigator acting on behalf of the MLB used intimidation and illegal conduct by threatening to use his connections in law enforcement to bring false charges against Nix, in order to continue their investigation and interference with DNA Sports Lab's business.

122. Defendant Boland, acting on behalf of the MLB, used improper means and illegal conduct to hack into and dismantle DNA Sports Lab's social media accounts including, YouTube, Facebook, and PayPal, causing further damage to Plaintiff's ability to do business.

123. As a result of Defendants' tortious interference with Nix's and DNA Sports Lab's business relationships, Nix's and DNA Sports Lab's reputation was tarnished in the athletic community and DNA Sports Lab lost many existing and prospective clients.

124. As a result of Defendants' further conduct in intentionally and unjustifiably interfering with Nix's and DNA Sports Lab's online media platforms, Plaintiff's ability to elicit and transact business worldwide was severely restricted and as a result Plaintiffs' lost millions of dollars' worth of existing clients and prospective business.

## AS AND FOR A SECOND CAUSE OF ACTION

### *Defamation*

125. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint.

126. A defamatory statement was released by Defendant MLB concerning Nix on or about July 14, 2016.

127. The defamatory statement falsely stated that ". . . Nix admits to selling products purportedly containing at least one banned performance-enhancing substance (IGF-1). . ."

128. The statement falsely implies that Nix markets and sells at least and possibly more than one banned performance-enhancing substance.

129. IGF-1 is a substance commonly found in milk, meat, and other common foods consumed on a daily basis.

130. The statement was disseminated by several national media outlets and websites.

131. The statement constitutes defamation because the false statement and implications arising from the statement are of the kind tending to expose a person to contempt, aversion, and/or to induce unsavory opinion of the individual in the minds of a substantial number of the professional community Nix was servicing.

132. Nix has suffered damages in an amount exceeding the monetary jurisdictional limits of all lower courts.

133. Defendant's conduct was so outrageous, wanton, willful and malicious that Nix should be awarded punitive damages as awarded by the jury in an amount exceeding the monetary jurisdictional limits of all lower courts.

## AS AND FOR A THIRD CAUSE OF ACTION

### *Defamation Per Se*

134. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint.

135. The defamatory statement was released by the MLB concerning Nix on or about July 14, 2016.

136. The defamatory statement falsely stated that ". . . Nix admits to selling products purportedly containing at least one banned performance-enhancing substance (IGF-1). . ."

137. The statement falsely implies that Nix markets and sells at least and possibly more than one banned performance-enhancing substance.

138. The statement was disseminated by several national media outlets and websites.

139. The statement constitutes defamation per se because the false statement and implications arising from the statement are of the kind tending to expose a person to contempt, aversion, and/or to induce unsavory opinion of the individual in the minds of a substantial number of the community.

140. Nix has suffered damages in an amount exceeding the monetary jurisdictional limits of all lower courts.

141. Defendant's conduct was so outrageous, wanton, willful and malicious that Nix should be awarded punitive damages as awarded by the jury in an amount exceeding the monetary jurisdictional limits of all lower courts.

## AS AND FOR A FOURTH CAUSE OF ACTION

### *Computer Fraud and Abuse Act, 18 U.S.C. 1030*

142. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint.

143. Upon information and belief, in retaliation for Nix's filing of the complaint, MLB began hacking/attacking DNA Sports Lab's social media accounts, severely disrupting Nix's ability to do business.

144. Defendants herein knowingly and with the intent to defraud and cause damage, illegally accessed the protected computer and/or accounts owned by Plaintiffs, without authorization.

145. The computers and accounts owned and used by Plaintiffs are utilized for domestic and international business, as the Plaintiffs conducts a large amount of business with international clients.

146. Since the commencement of the business, Plaintiffs and DNA Sports Lab have made millions of dollars in sales internationally by advertising its product in a YouTube video appearing on its website, on Facebook, and finalizing transactions utilizing PayPal.

147. Defendant Boland, acting on behalf of the MLB, used improper means and illegal conduct in order to hack and -interfere with DNA Sports Lab's social media accounts including, YouTube, Facebook, and PayPal, causing extensive damage to Plaintiff's ability to do business.

148. Upon the investigation it was discovered that the illegal access of Plaintiffs' social media accounts was linked to IP addresses belonging to MLB in both New York and Florida.

149. Plaintiffs' primary social media platforms used to conduct both domestic and international business such as YouTube, Facebook, and PayPal were all interfered with as a direct result of the Defendants' illegal actions.

150. Plaintiff's primary and social media platforms used to conduct both domestic and international business such as You Tube, Facebook, and Pay Pal were all dismantled as a direct result of the Defendants' illegal actions.

151. As a result of MLB interfering with DNA Sports Lab's social media and PayPal accounts, DNA Sports Lab experienced a huge decrease in online sales, as well as significant monetary loss, which cost Plaintiffs' millions of dollars.

152. The damage caused includes but is not limited to loss of revenue, costs incurred, and/or other consequential damages incurred due to the interruption of service of Plaintiffs' social media platforms.

153. Nix has suffered damages in an amount exceeding the monetary jurisdictional limits of all lower courts.

154. Defendant's conduct was so outrageous, wanton, willful and malicious that Nix should be awarded punitive damages as awarded by the jury in amount exceeding the monetary jurisdictional limits of all lower courts.

### AS AND FOR A FIFTH CAUSE OF ACTION
*Permanent Injunction*

155. Plaintiffs repeat, reiterate, and reallege each and every allegation made in the above paragraphs of this Complaint.

156. At all times set forth herein above, MLB, through its agents and affiliates, made unjustifiably fraudulent misrepresentations to Plaintiffs' clients and prospective future clients.

157. At all times set forth herein above, MLB, through its agents and affiliates, used improper means during the investigation of Nix and DNA Sports Labs by stating that Plaintiffs were in the business of selling illegal/banned substances and/or were in some way associated with the Biogenesis scandal.

158. At all times set forth herein above, MLB through its agents and affiliates, used improper means and illegal conduct to hack into and dismantle DNA Sports Lab's social media accounts including, YouTube, Facebook, and PayPal, causing further damage to Plaintiffs' ability to do business.

159. On or about July 14, 2016, MLB through its agents and affiliates, released a defamatory statement which falsely stated that ". . . Nix admits to selling products purportedly containing at least one banned performance-enhancing substance (IGF-1). . ."

160. The statement was made by MLB even though MLB had no evidence that Nix ever sold products containing banned performance substances to MLB players.

161. As a result of Defendants' aforesaid conduct in intentionally and unjustifiably interfering with Nix's and DNA Sports Lab's business practices and online media platforms, Plaintiff's ability to elicit and transact business worldwide was severely restricted and as a result Plaintiffs' lost millions of dollars' worth of existing clients and prospective business.

162. Defendants have individually and collectively violated and continuously violate Plaintifs' right to conduct business without unlawful interference by Defendants.

163. Plaintiffs have no adequate remedy at law to remedy the Defendants past, present and continuous interference with Plaintiffs' right to conduct business.

164. Serious and irreparable injury has resulted and will result to Plaintiffs' business and reputation if an injunction is not granted directing Defendants to permanently cease and desist in engaging in actions destructive to Plaintiffs' business.

165. Based upon the facts and circumstances alleged herein the equities in this matter are balanced in the Plaintiffs' favor.

**WHEREFORE,** as to the First, Second, Third and Fourth causes of action, Plaintiffs demand judgment against Defendants jointly and severally, for all compensatory and punitive damages that exceed the jurisdictional limit of all the lower Courts; and as to the Fifth cause of action, the granting of a permanent injunction as directed to all Defendants, enjoining them from taking any actions post judgment harmful and destructive to Plaintiffs' business, together with any other applicable relief, including attorneys fees, that this Court deems just and proper.

Dated: November 9, 2016
      New York, New York

By: Vincent P. White, Esq.
Attorney for Plaintiff
570 Lexington Ave, Suite 1600
New York, NY 10022

## VERIFICATION

STATE OF ~~NEW YORK~~ TEXAS )
                        ) SS.:
COUNTY OF HARRIS )

NEIMAN NIX, being dLtly sworn, deposes and says:

Tl1at I arn tl1e individtl1al plai1ltiff and President of DNA SPORTS PERFORMANCE LAB, fNC. in the witlli1l actio1l; that I have read tl1e foregoing Summ101ls alld Co1l1plai1lt alld kJIow tl1e co1ltcnts thereof; the same is trl1c to the best of n1y kllowledge, except as to tl1ose 1l1atters tl1erei1l stated to be allegg̃d upon i11formnatio1 arld belief alld as to tl1ose 1l 1áter,I believe it to be trt1e.

_____
NEIMAN NIX  individual y and on behalf of DNA.SPORTS PEI̶FQRMANCE  LAB, INC.

Sworn to before me tl1is
2  d a y  of Novernber, 2016.

_____
Notary Public

LAWR FOX POOLE
Notary Public, State of Texas
Comm. Expires 03-21-2018
Notary ID 12976666-4